IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 21, 2009

STATE OF TENNESSEE v. DAVID ANTHONY AVERY and FREDERICK
ALEXANDER AVERY (a/k/a ALEX AVERY)

Direct Appeal from the Criminal Court for Davidson County
No. 2006-C-2451    Cheryl Blackburn, Judge

No. M2008-01809-CCA-R3-CD - December 10, 2009

A Davidson County jury convicted the Defendants, David Anthony Avery and Frederick Alexander
("Alex") Avery, of aggravated robbery, especially aggravated robbery, reckless endangerment, and
attempted second degree murder. The trial court sentenced David Avery to a forty-nine year
effective sentence and Frederick Avery, a violent offender, to life without the possibility of parole.
On appeal, David Avery contends: (1) the evidence is insufficient to sustain his convictions; (2) the
trial court erred when it enhanced his sentences; and (3) the trial court erred when it ordered his
sentences run consecutively. On appeal, Frederick Avery contends: (1) the evidence is insufficient
to sustain his convictions; and (2) the trial court erred when it sentenced him as a violent offender.
After thoroughly reviewing the record and applicable authorities, we affirm the trial court's
judgments.

Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and
THOMAS T. WOODALL, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the Appellant, David Anthony Avery.

Dumaka Shabazz, Nashville, Tennessee, for the Appellant Frederick Alexander Avery.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Melissa
Roberge, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rob
McGuire, Assistant District Attorney General, for the Appellee, State of Tennessee.

OPINION
I. Facts
A. Trial

This case arises from the June 23, 2006, robbery of a couple, whose throats were slit during the commission of the robbery. For these events, a Davidson County grand jury indicted the Defendants for two counts of especially aggravated robbery and two counts of attempted first degree murder. At their joint trial on these charges, the following evidence was presented: Stephanie Regen testified that in June 2006 she lived with her then boyfriend, Samuel Gift, in the Hunters Pointe Apartment Complex. She said she and her boyfriend sold mostly cocaine but also some marijuana as their sole source of income.

Regen testified David Avery, whom she had known for five or six months, called her the morning of June 23, 2006, and said that he was coming to purchase drugs. She and Gift were alone in their apartment when David Avery and his sister Iris Avery came to purchase narcotics that morning. David Avery gave Regen ten dollars, and she went to a safe, to which only she and Gift had keys, in which they kept the drugs and drug proceeds, and retrieved the drugs. Regen then weighed the drugs, and gave the drugs to Avery. Regen recalled she and Gift kept scales and drugs proceeds in the safe along with the narcotics that they distributed. She estimated that the amount of proceeds contained in the safe at that time was approximately $2700.

Regen said David Avery called her later that day and asked if she was home. He then "hung up" on her. David Avery returned to her apartment at around 4:00 p.m. with his brother Alex Avery, whom she had never met. Gift looked through the peephole, and then Regen allowed the two men into the apartment. The two men talked for a few minutes with Gift and Regen while in their living room. David Avery then followed Regen into the kitchen where the safe was located, while Alex Avery and Gift stayed in the living room. Regen said she opened the safe and started weighing out the drugs. As she did this, David Avery grabbed her hair and slit her throat with a box cutter in one long cut. At the same time, he grabbed the contents of the safe. Regen heard David Avery yell something to the effect of "it's on" to Alex Avery in the livingroom.

Regen said her memory of the events that followed her throat being cut were a little "sketchy." She recalled, however, David Avery leading her by Gift and Alex Avery and then to the bedroom of the apartment. Upon entering the room, David Avery immediately asked where they kept their gun. She showed him, and he attempted to cut her again. She said she grabbed the box cutter, which badly sliced her finger. David Avery then told her to get onto the bed. Alex Avery brought Gift into the bedroom, holding the gun Regen had given to Alex Avery to Gift's side. Alex Avery told Gift to get onto the bed, and David Avery cut Gift with the box cutter from behind one ear to halfway across his throat. Regen said that Gift lost a large amount of blood and that blood clots were coming from the wound in his neck.

Regen recalled she then heard Alex and David Avery discussing whether they should shoot Gift and Regen. The two Defendants discussed how many bullets were in the gun, and the Defendants asked Gift and Regen how many bullets the weapon contained. David Avery then said, "[J]ust shoot them." Regen said she and Gift started begging for their lives. Gift said to the Defendants, "[L]ook at all this blood, I am going to die anyway." The Defendants responded that Gift and Regen knew too much about them. Regen told the Defendants she would tell the police that

2

she and Gift had left the screen door open, and they did not know who had attacked them.

The two Defendants left without shooting Gift and Regen, and Regen called 911. When emergency personnel failed to immediately arrive, she began to knock on her neighbors' doors and eventually found a couple who helped them. Regen said that, although she did not initially identify the attackers, she eventually gave their names to the first officer responding to the scene. She did not, however, give him the details of the attack, including that drugs were involved. Both Regen and Gift were transported to Vanderbilt. She received numerous stitches on her neck, which left a scar. Gift was hospitalized for several days.

Regen said she spoke to police after she was released from the hospital. Shortly after the attack she was afraid to identify her attackers because she was worried they would return since she survived the attack. Regen told the first detective who arrived at the hospital that she did not know who attacked her because she was scared she was going to be in trouble for selling drugs. Detective Newburn then arrived to the hospital and reassured her he was not with the narcotics unit and would not arrest her. Regen said she "broke down" and started crying. She told the detective the details of the attack, including that drugs were involved. Regen identified the Defendants as the men who attacked her.

On cross-examination, Regen discussed the procedure she used to sell drugs. She conceded that she had never been charged with selling drugs in connection with this case. She testified she was not sure which of David Avery's hands held the box cutter. She agreed that, although they had electronic equipment in the house, the Defendants took only money, drugs, and the gun.

Regen testified that neither David or Alex Avery appeared angry until after she weighed out the drugs. She agreed that she did not see Alex Avery in possession of a weapon when he came to the house. She recalled Alex Avery looking though her bedroom drawers for money, but she was unsure whether this was before or after Gift's throat was cut. She agreed that Alex Avery could have shot her but did not.

Samuel Nathaniel Gift testified that he lived with Regen at the time of the attack. At the time, he had been convicted of possession of marijuana for resale and facilitation of possession of cocaine for resale. Gift testified he had known David Avery most of his life because David Avery was Gift's best friend's cousin. He had only heard of Alex Avery before the attack.

Gift did not recall David Avery coming to his apartment the morning of June 23, 2006, to purchase drugs but said that David Avery had purchased drugs from him on different occasions before this incident. He recalled that he kept the drugs that he sold in a safe, to which only he and Regen had a key, located in the kitchen. On June 23, 2006, David and Alex Avery came to his apartment to purchase drugs. Regen let them into the apartment, and Gift spoke with Alex Avery in the living room. He said Regen and David Avery went into the kitchen and Alex Avery stayed in the living room with him, where Gift was taking apart an X-BOX using a drill.

3

Gift testified that he heard the safe in the kitchen slam closed and Regen gasp. When he looked up, he saw David Avery standing over Regen with his hand across her throat. Gift said he attempted to get off the couch and go to the kitchen but Alex Avery pushed him back down. Gift yelled "what's going on[?]" to David Avery, who responded "you know what it is." Gift assumed at that point that David Avery was attempting to rob him. Alex Avery told Gift, who was trying to see into the kitchen, to "be cool" and assured him that neither he nor Regen would be hurt during the robbery. Alex Avery then attempted to hit Gift with the drill Gift had been using to fix the X-BOX, and the two men began to physically fight. Gift said David Avery then told Alex Avery to bring Gift into the bedroom, and Gift did not resist because he knew Regen was in the bedroom and wanted to see if she was okay. He also thought that Alex Avery may have had another box cutter.

In the bedroom, David Avery asked Gift if there were any more drugs or money in the house. Gift noticed that Regen was bleeding from her neck and that flesh was hanging from her neck. He said he turned to Alex Avery and reminded him of his assurance that they would not harm anyone. David Avery told Alex Avery to put Gift on his knees on the floor. Gift told the men that no other guns were in the house. David Avery told Alex Avery, who had a gun, to shoot Gift because Gift knew too much about them, but Alex Avery indicated he did not want to kill Gift. Alex Avery had a towel around the gun, which Gift assumed was to prevent the transfer of fingerprints, but the towel prevented Alex Avery from inserting his finger into the trigger guard. David Avery grew upset with Alex Avery's hesitation and grabbed Gift by the back of the head and slit his throat. Gift said he began bleeding significantly, and the attackers continued to discuss whether they should shoot Gift and Regen. Gift said he told the men to leave because he was going to die anyway, judging from the amount of blood that was rushing out of his neck. Gift told the men that he would say that someone had left the screen door open and they did not know who had come into the apartment to rob them. The two men then left the apartment. Gift said this whole encounter lasted approximately fifteen minutes.

After the men left, Regen wrapped something around Gift's neck while they attempted to call police. They left the apartment and asked a man nearby for help. Gift said he was "bleeding everywhere," but he attempted to apply pressure to his wound. Gift recalled that his vision went black and that he lay on the steps. He could still hear and attempted to remain conscious, thinking that if he went to sleep he would die. The ambulance then arrived and transported him to the hospital where he was treated for his injuries.

Gift identified David Avery as his attacker, but he could not positively identify Alex Avery, saying that he had only seen him once before.

On cross-examination, Gift agreed that, when the attack first started, he could not hear the conversation between Regen and David Avery. Gift agreed that he was on probation for felony drug convictions at the time of this robbery. He agreed he knew it was illegal to sell drugs and to possess the weapon that was in his apartment. Gift conceded that he had not been charged with selling drugs or possession of a weapon for his actions on the day of this robbery. Gift agreed that neither of the Defendants attempted to take Gift or Regen's cell phones before leaving, and they did not take any

4

other things of value located in the apartment.

James David Guschke testified that, at around 4:00 p.m., on June 23, 2006, he had just pulled into his apartment parking lot when he saw Gift and Regen exit their apartment covered in blood. Gift had a towel to his neck and Regen was on the phone. Guschke said he offered assistance and tried to get Gift and Regen to sit down. Regen, who had a large wound that was bleeding profusely on her neck, refused and remained on the phone with emergency personnel. Gushcke had Gift, who had "chunks of coagulated blood coming" from his neck, sit down and placed another towel tightly around his neck. Gift's eyes started to roll into his head, and Gushcke asked him his name to try to keep him awake. Gift told Gushcke that he had been attacked and robbed. Gushcke asked him who had attacked him, and Gift said that it was his friends, "David" and "Al." Shortly thereafter, emergency personnel arrived and took over.

Detective Bryan Doersam testified he was the first officer to respond to the scene, and, when he arrived, he saw a man and a woman sitting on the sidewalk inside the apartment complex. There appeared to be a large amount of blood surrounding them and several people standing near them. They both appeared to be bleeding from their neck and were obviously in distress. He described both victims as distraught, and said Gift appeared to be losing consciousness and to be in physical distress from his injuries. Detective Doersam said that, while they waited for medical personnel to arrive, he spoke with Regen. Regen told him she had opened the door for two men familiar to her named David and Al Avery, and David Avery cut her throat with a box cutter. Medical personnel arrived and transported the two victims to the hospital. After the victims left, Detective Doersam and other officers went to the victims' apartment and secured the crime scene. The detective's incident report listed the names of the two suspects involved in this assault as David and Alex Avery. On cross-examination, the detective agreed that his report did not mention a robbery, and he was unsure whether Regen told him that the suspects had robbed them at the time of the assault.

Officer Robert K. Smith, with the Metro Police Department, testified he served an arrest warrant on Alex Avery on June 24, 2006. The officer arrested Alex Avery at 3110 Priest Woods Drive and transported him to the police station, where he learned there was a handgun at the 3110 address. He returned to the home at 12:30 and found a twenty-five caliber Raven pistol rolled up in a dark T-shirt, which was inside a brown purse inside a closet. On cross-examination, Officer Smith testified Alex Avery did not resist arrest, and he told detectives the precise location of the gun. The gun, he assumed, was loaded because bullets accompanied the gun police seized.

Felicia Evans, a crime scene investigator with the Metro Nashville Police Department, testified she was called to the Drake Motel, where David Avery had been arrested. She photographed the room where David Avery had been arrested, and she saw a box cutter on the dresser in the room. The box cutter tested negative for blood and the blade of the box cutter did not appear to match the razor blade police found at the victims' apartment. On cross-examination, Officer Evans testified that she arrived at the scene after David Avery had been arrested, and she never saw him inside the room.

5

Iris Avery, the Defendants' sister, testified that she faced two counts of attempted first degree murder and two counts of especially aggravated robbery for her role in this case. She said she took David Avery to the victims' apartment on the day of the attack so he could purchase drugs. After purchasing drugs, the two went to their mother's house, where their brother, Alex Avery, joined them later that afternoon. Iris Avery said she was present and heard her brothers discussing "going to get some money," which she understood to mean that they were going to commit a robbery. David Avery asked her to drive them back to the victims' apartment. She did, aware they intended to commit a robbery, and she saw David and Alex Avery enter the victims' apartment. They emerged from the apartment ten or fifteen minutes later, and Alex Avery, who was smiling, told her that nobody was dead. Iris Avery drove Alex Avery home, her brothers gave her $500 for her help, and the three never discussed the robbery again.

Iris Avery testified David Avery told her the following day, after police took Alex Avery into custody, that the robbery became violent. David Avery told her that he did not do what the police alleged. She tried to convince him to turn himself into the police, but he refused. Iris Avery said she was arrested in July 2006 for her participation in this robbery. At first, she denied her role to police, explaining she was scared. After a few minutes, however, she disclosed her role in the robbery.

On cross-examination, Iris Avery testified that, during the conversation with her brothers at her mother's house, neither brother used the word "robbery." In fact, the two discussed going to the victims' house to get money that the victims owed them. She did not know how much money the victims owed her brothers, and she did not see either brother with a weapon of any kind, either before they entered or after they exited the apartment. She also did not see blood on either brother. She agreed that she was hoping to receive a favorable deal on her charges for her cooperation but insisted nothing had been promised to her. Iris Avery testified that Alex Avery gave her the money she received for her assistance.

Based upon this evidence, the jury found the Defendants guilty of aggravated robbery, especially aggravated robbery, reckless endangerment, and attempted second degree murder.

## B. Sentencing

At the Defendants' sentencing hearing, the following occurred: The State filed a notice that Alex Avery should mandatorily be sentenced to life without the possibility of parole for his conviction of especially aggravated robbery. The State also agreed that David Avery was a Range I, standard offender, but that, because several enhancement factors applied, David Avery's sentences should run consecutively.

The State then offered two certified copies of criminal convictions, showing that Alex Avery had been convicted on August 13, 1993, of second degree murder and robbery. The murder occurred on February 7, 1992, and the robbery occurred on March 31, 1991.

When sentencing David Avery, the trial court found that the following enhancement factors

6

applied to all counts: enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors; enhancement factor number (5), that the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. To counts 3 and 4, the trial court applied enhancement factor number (9), that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. T.C.A. §§ 40-35-114(1), (2), (5), & (9). The trial court found no mitigating factors applied. The trial court sentenced David Avery to twelve years for the aggravated robbery conviction, twenty-five years for the especially aggravated robbery conviction, twelve years for the attempted second degree murder conviction, and eleven months and twenty-nine days for the reckless endangerment conviction. The trial court ordered all the sentences except the reckless endangerment sentence to run consecutively, for a total effective sentence of forty-nine years.

When sentencing Alex Avery, the trial court found Alex Avery was a violent repeat offender with regard to his conviction for especially aggravated robbery. Accordingly, the trial court sentenced Alex Avery to life without the possibility of parole for that conviction. The trial court found the following enhancement factors applied to all of Alex Avery's convictions: enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors; enhancement factor number (5), that the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; enhancement factor (11), that the felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has been previously convicted of a felony that resulted in death or bodily injury; and enhancement factor (13), that the defendant was on parole when these offenses were committed. T.C.A. §§ 40-35-114 (1), (2), (5), (11) & (13). To counts 3 and 4, the trial court applied enhancement factor number (9), that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. The trial court sentenced Alex Avery to twenty years for the aggravated robbery conviction, life without the possibility of parole for the especially aggravated robbery conviction, eleven months and twenty-nine days for the reckless endangerment conviction, and twenty years for the attempted second degree murder conviction. The trial court ordered that all Alex Avery's sentences except reckless endangerment sentence run consecutively, for a total effective sentence of life without the possibility of parole plus forty years.[1]

## II. Analysis

On appeal, David Avery contends: (1) the evidence is insufficient to sustain his convictions;

---

[1] The trial court noted that, in the event that an Appellate Court reverses its decision to apply the repeat violent offender statute and sentences Alex Avery to forty years for the especially aggravated robbery conviction, the reckless endangerment sentence will run consecutively to the other convictions for a total effective sentence of eighty-one years.

(2) the trial court erred when it enhanced his sentences; and (3) the trial court erred when it ordered his sentences run consecutively. On appeal, Alex Avery contends: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it sentenced him as a violent offender because the State's notice was insufficient and the trial commenced outside the prescribed time for the violent offender statute to apply.

## A. Sufficiency of Evidence

David Avery challenges his convictions asserting that there was no physical evidence that he was ever in the apartment and that the injuries sustained by the victims were not medically proven to be serious. Alex Avery challenges his convictions saying that the evidence is insufficient to support his robbery conviction because there was no testimony from Regen that he took any money from her. Further, he asserts that, because Gift owned the gun, no evidence suggested that he took anything at all from Regen. As such, he says, his robbery conviction cannot stand. Alex Avery further avers that there is no evidence that he intended to commit especially aggravated robbery, aggravated robbery, or attempted homicide. In fact, he asserts, there was no evidence he caused any physical injury or violence to either victim.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). In such cases, however, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835

(Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d at 659.

### 1. Aggravated Robbery of Regen

Both Defendants were convicted of the aggravated robbery of Regen. David Avery asserts that there was no physical evidence proving that he was inside the victims' apartment. Further, he asserts that the testimony did not prove anything was taken from the home because Regen testified the only items taken were illegal drugs and money contained in the safe, but Gift testified the men left the safe at the apartment. David Avery also contends no medical proof demonstrated that the Gift's injuries were serious. Alex Avery alleges that he did not go into the apartment with the intent to commit a robbery, and there was no evidence he possessed a weapon when he entered. Further, he states, there was no evidence that he inflicted any injury to Regen.

Aggravated robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" while the perpetrator uses a "deadly weapon or [ ]display[s] [such an] article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-401, -402 (2006). Tennessee Code Annotated section 39-11-402(2) provides that a defendant is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense[.]" A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both. T.C.A. § 39-11-401(a). "Each party to an offense may be charged with commission of the offense." T.C.A. § 39-11-401(b).

9

We conclude that the evidence, viewed in the light most favorable to the State, is sufficient to sustain David Avery's conviction of aggravated robbery. First, we note that physical evidence is not required as a basis for a jury's determination of identity. The identity of the defendant as the perpetrator of the offense is a question of fact for the jury. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. *Id.* Here, David Avery was a person whom both victims knew and to whom they had previously sold drugs. When he arrived at the house, they identified him before allowing him entry into their apartment. This is sufficient to prove his identity. The evidence also proves that David Avery followed Regen into the kitchen where she and Gift stored their drugs and money in a safe. After she opened the safe, David Avery grabbed its contents, brandished a box cutter, and slit Regen's throat. Regen said the safe contained approximately $2700 in cash before the robbery. David Avery then brought Regen into her bedroom and forced her to give him the gun she and Gift owned, and he and Alex Avery took that gun with them when they left. The Defendants paid Iris Avery $500 from the proceeds of the robbery for assisting them in the robbery. This evidence is sufficient to sustain David Avery's conviction.

The State prosecuted Alex Avery under the theory of Alex Avery's criminal responsibility for David Avery's actions during the commission of this offense. The evidence proved Alex Avery and David Avery planned to go to the victims' apartment and take money from them: Iris Avery heard a conversation between Alex and David Avery from which she gleaned they intended to rob the victims. Alex Avery entered the apartment with David Avery and detained Gift in the living room while David Avery took money from the safe. He told Gift that if he remained calm no one would be hurt, and, when Gift attempted to get to Regen, Alex Avery hit Gift in the head with a drill. Alex Avery then received the gun from David Avery, and the two discussed whether Alex Avery should shoot the victims. Alex Avery left the apartment with the weapon and paid his sister $500 for her assistance in the robbery. Police found the victims' gun hidden in a closet at Alex Avery's residence. This evidence proves that Alex Avery both intended to assist David Avery in the commission of this offense and did in fact aid David Avery in committing this offense. The evidence is, therefore, sufficient to sustain his conviction.

## 2. Especially Aggravated Robbery of Gift

David Avery contends that there was no proof that anything was taken and that there was no medical proof that the injuries sustained were serious. Alex Avery alleges that he did not go into the apartment with the intent to commit a robbery, and there was no evidence he possessed a weapon when he entered. Further, he states, there was no evidence that he inflicted any injury to Gift.

Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is accomplished with a deadly weapon and results in serious bodily injury to the victim. T.C.A. §§ 39-13-401(a), 403(a)(1)-(2). "'Serious bodily injury' means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement;

10

or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34). "Deadly weapon" means "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." T.C .A. § 39-11-106(a)(5). Tennessee Code Annotated section 39-11-402(2) provides that a defendant is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense[.]"

We conclude the evidence, viewed in the light most favorable to the State, is sufficient to sustain David Avery's conviction for the especially aggravated robbery of Gift. As previously stated, there is sufficient evidence that David Avery took property, the gun, from Gift while placing him in fear. Further, the jury heard of the medical treatment Gift underwent as a result of the cuts inflicted with the boxcutter and viewed his scar as a result of the injury. The jury also heard how Gift underwent several surgeries to make his scar less visible. As such, the evidence established Gift sustained a serious bodily injury. *See State v. Shanda Alene Wright*, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App., at Nashville, Feb.11, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008) (holding that scar on scalp and three-centimeter scar on forearm were sufficient to establish the element of serious bodily injury); *State v. Anthony D. Forster*, No. M2002-00008-CCA-R3-CD, 2003 WL 1715922, at *10 (Tenn. Crim. App., at Nashville, Apr. 1, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003) (holding that scar from bridge of victim's nose to upper lip was sufficient for jury to find protracted or obvious disfigurement even where only medical treatment received by victim was application of a butterfly bandage). This evidence is sufficient to prove that Gift sustained serious bodily injury as a result of this attack.

The evidence is also sufficient to sustain Alex Avery's conviction for the especially aggravated robbery of Gift. Iris Avery's testimony supported that Alex Avery went to the victims' apartment with the intent to commit a robbery therein. He obtained the gun owned by Regen and Gift and used it to contain the victims while he and David Avery discussed whether they should shoot the victims. He left the apartment with the gun and the proceeds of the robbery, some of which he shared with Iris Avery. This evidence proves that Alex Avery acted with intent to assist David Avery in the commission of this offense and aided David Avery in committing this offense. Further, as stated above, the evidence sufficiently supports that Gift suffered serious bodily injury. The evidence is, therefore, sufficient to sustain his conviction.

### 3. Reckless Endangerment of Regen

David Avery contends there was no medical proof that Regen was placed in any reasonable probability of danger, a fact necessary for a reckless endangerment conviction. Alex Avery contends that there was no evidence he desired or caused any physical injury or violence to Regen.

11

"A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a).

The evidence, viewed in the light most favorable to the State is sufficient to support David Avery's conviction for reckless endangerment of Regen. He slit her throat with a box cutter. This clearly placed Regen in imminent danger of serious bodily injury. The evidence is sufficient to support his conviction.

Similarly, the evidence is sufficient to support Alex Avery's conviction for reckless endangerment of Regen. After David Avery sliced Regen's throat with a box cutter, Alex Avery prevented Gift from rendering Regen aid by keeping Gift in the living room. He then lead Gift at gun point to the room where Regen was located, and he and David Avery discussed whether to kill Regen and Gift. During this time, he held Regen and Gift at gunpoint in the bedroom, which prevented them from immediately seeking medical attention, despite that Regen was visibly bleeding. This evidence proves that Alex Avery acted with intent to assist David Avery in the commission of this offense and aided David Avery in committing this offense. The evidence is, therefore, sufficient to sustain his conviction.

### 4. Attempted Second Degree Murder of Gift

David Avery asserts there was no evidence that he attempted to kill Gift because no shots were fired and because Gift's testimony that he persuaded the Defendants to leave by promising to tell police that a stranger attacked him, proves that he did not intend for Gift to die. Further, he asserts that he did not take either victim's cell phone or attempt to prevent either from seeking medical attention. Alex Avery contends that there was no evidence he desired to cause or caused any physical injury or violence to Gift. In fact, he argues, he "kept his word" to Gift that he would not be harmed.

Second degree murder is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). A person attempts to commit second degree murder when he or she acts with intent to knowingly kill the victim and believes his or her conduct will cause the victim's death without further conduct on the person's part. T.C.A. § 39-12-101(a)(2).

The evidence, viewed in the light most favorable to the State, is sufficient to sustain David Avery's conviction for the attempted second degree murder of Gift. David Avery discussed whether Alex Avery should shoot Gift, and, at some point before, during, or after that conversation, he slit Gift's throat with a box cutter. The photographic evidence admitted at trial showed that Gift lost a substantial amount of blood while in the bedroom. While the two men were discussing whether they should also shoot Gift, Gift encouraged them to leave without shooting him, explaining his neck wound was likely fatal. This is sufficient to sustain David Avery's conviction for attempted second degree murder.

12

Similarly, the evidence is sufficient to sustain Alex Avery's conviction for attempted second degree murder. Alex Avery and David Avery decided to go to the victims' apartment together to take the victims' money. They entered the apartment together, and Alex Avery detained Gift while David Avery took money and drugs from the victims' safe. Alex Avery then held Gift and Regen at gun point while David Avery sliced Gift's throat. The two left the scene together with the proceeds from the robbery. Alex Avery clearly aided David Avery in his attack of Gift. After agreeing that Gift would bleed to death from his injuries, the two men left the apartment. This evidence is sufficient to sustain Alex Avery's conviction for attempted second degree murder.

## B. Sentencing

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2006), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

### 1. David Avery Sentencing

13

David Avery contends that the trial court erred when it applied enhancement factors (1), (2), (5) and (9) to enhance his sentences. Further, he contends the trial court erred when it ordered his sentences run consecutively.

### a. Enhancement Factors

David Avery asserts that the trial court erred when it applied enhancement factor (1), that he had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. He states that there was no evidence that he had "ever been convicted of any aggravated charges before this case." He asserts the trial court improperly applied enhancement factor (2), that he was "the leader in the commission of an offense involving two or more criminal actors," because there was no evidence that he in any way directed his co-defendant to act in a way he was not pre-disposed to act. As to enhancement factor (5), that he treated the victims with exceptional cruelty, he asserts that there was no proof of such in the record. Finally, he asserts the trial court improperly applied enhancement factor (9), that defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense, because he acquired the firearm after the alleged robbery and no shots were fired. The State counters that the trial court properly considered and applied these four relevant enhancement factors.

The trial court found:

> Looking at Mr. David Avery the following enhancing factors do apply. And I will make note as to those that apply only to certain counts. Factor number one does apply [to all counts]. He has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. As mentioned in the presentence report he has five misdemeanor convictions. I might also note from the record we have a history of purchasing drugs from the actual victims. He had been there earlier that day, and that would involve criminal behavior.

> Factor number two applies [to all counts], that the defendant was a leader in the commission of an offense involving two or more criminal actors. One does not have to be the only leader or the only one involved, but Mr. David Avery definitely qualifies. He is the one that grabbed Ms. Regen by the neck and put a box cutter to it. He's the one that said shoot them according to the record. He's the one that told Mr. Frederick Avery to bring Mr. Gift into the other room. And he's the one that had the gun, and he's the one that slit Mr. Gift's throat. And he's the one that started talking about executing them. So he definitely qualifies as a leader in the commission of the offense.

> . . . .

14

Factor number five, this is the one that we have talked about. That is, that the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. . . . [This factor] require[s] a culpability greater than that necessary for the crime. . . . I find that that factor does apply. He told Mr. Frederick [Alex] Avery to kill. I think the most interesting or the thing that is the most horrible would be the discussion of how to execute these people that the victims were overhearing in terms of the gun. And then there was the discussion about, well, they're just going to die anyway. There was a discussion about that, well, they know us and about they're able to recognize us. All of that is an exceptional cruelty of knowing that somebody is discussing how to execute you. That makes factor number five appl[y to all counts].

. . . .

Factor number nine does apply as to Counts 3 and 4 only. And, that is, that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. He actually employed a box cutter as well as a firearm, not only employed but taken in this case.

. . . .

Looking at any mitigating factors, I have looked at them all, even the catchall factor, and I find that none apply. . . .

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The Tennessee Code allows a sentencing court to consider the following enhancement factors, among others, when determining whether to enhance a defendant's sentence: (1) that the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (2) that he was the leader in the commission of an offense involving two or more criminal actors; (5) that he treated the victims with exceptional cruelty; and (9) that he possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. T.C.A. § 40-35-114(1), (2), (5), and (9) (2006).

If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114 (2006). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the

defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *Carter*, 254 S.W.3d at 343.

The Defendant is a Range I offender, and especially aggravated robbery is a class A felony, with an appropriate sentencing range of fifteen to twenty-five years. T.C.A. §§ 39-13-401(a), -403(a)(1)-(2) and T.C.A. § 40-35-112(a)(1). Aggravated robbery and attempted second degree murder are class B felonies, with an appropriate sentencing range of eight to twelve years. T.C.A. §§ 39-13-401, -402; T.C.A. § 39-11-302(b); T.C.A. § 39-12-101(a)(2); and T.C.A. § 40-35-112(a)(2). Reckless endangerment, for purposes of this case, is class A misdemeanor, with a maximum sentence of eleven months and twenty nine days. T.C.A. § 39-13-103(b). The trial court sentenced David Avery twenty-five years for especially aggravated robbery conviction, twelve years for the aggravated robbery conviction, twelve years for attempted second degree murder, and eleven months and twenty-nine days for the reckless endangerment conviction. For each conviction, the trial court sentenced David Avery to the maximum sentence within his sentencing range based upon the finding of four enhancement factors.

The trial court applied four enhancement factors: enhancement factor (1), that he had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (2), that he was the leader in the commission of an offense involving two or more criminal actors; enhancement factor (5), that he treated the victims with exceptional cruelty; and enhancement factor (9), that defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense.

We conclude the trial court did not err when it applied these four enhancement factors. First, the evidence supports the trial court's application of enhancement factor (1) based on David Avery's history of criminal convictions and criminal behavior. The evidence introduced at the sentencing hearing proved that Defendant Avery had five prior misdemeanor convictions and that he had previously engaged in criminal behavior by purchasing drugs from the victims. Contrary to David Avery's argument, the previous convictions do not have to be "aggravated" to support the application of this enhancement factor. This Court has held that a trial court may enhance a sentence pursuant to this enhancement factor based solely on a prior history of misdemeanor convictions. *State v. Ramsey*, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995); *see also State v. Joshua Glenn Trivette*, No. E2006-00129-CCA-R3-CD, 2007 WL 1687168, at *3 (Tenn. Crim. App., at Knoxville, June 12, 2007), *no Tenn. R. App. P. 11 application filed*. We conclude the trial court did not err when it applied enhancement factor (1).

The trial court also applied enhancement factor (2), that David Avery was the leader in the commission of an offense involving two or more criminal actors. This enhancement factor

16

does not require that the defendant be the sole leader but only that he be "a" leader. *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The evidence proved that David and Alex Avery entered the victims' home, and Alex Avery detained Gift while David Avery went to the kitchen with Regen, cut her throat, and stole money and drugs. David Avery then took Gift into the bedroom, asked Regen where her weapon was located, retrieved the weapon, and brought it to Alex Avery. David Avery told Alex Avery, who had a gun, to shoot Gift because Gift knew too much about them, but Alex Avery refused to shoot Gift. David Avery grew upset with Alex Avery's hesitation and grabbed Gift by the back of the head and slit his throat. We conclude the trial court did not err when it applied enhancement factor (2).

The trial court next applied enhancement factor (5), that David Avery treated the victims with exceptional cruelty. As our Supreme Court has explained:

> [P]roper application of enhancement factor (5) requires a finding of cruelty under the statute "over and above" what is required to sustain a conviction for an offense. *See State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995); *see also Poole*, 945 S.W.2d at 98 (requiring the facts in a case to "support a finding of 'exceptional cruelty' that demonstrates a culpability distinct from and appreciably greater than that incident to" the crime). In other words, such evidence must "denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *State v. Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. filed at Jackson, Mar. 14, 2000).

*State v. Arnett*, 49 S.W.3d 250, 258-59 (Tenn. 2001). The trial court noted that David Avery told Alex Avery to kill the victim. The two then discussed whether they should shoot and kill the victims while the victims begged for their lives. David Avery, upset with Alex Avery's hesitation, attacked Gift, who was on his knees, and slit his throat from ear to ear. He then remained in the room and discussed whether he should still shoot Gift. Gift begged David Avery to leave, attempting to convince him to go by telling him that he would bleed to death from his wounds, given the massive amount of blood that he was losing. We conclude the trial court did not err when it applied this enhancement factor.

Lastly, the trial court applied enhancement factor (9), that David Avery possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. After slitting Regen's throat, with a box cutter, David Avery brought Regen into her bedroom and demanded that she show him where her gun was hidden. She did so, and he obtained the gun. He brought the gun to Alex Avery, who used it to lead Gift into the bedroom and to keep him there while David Avery slit his throat with a box cutter. The two men retained the gun and box cutter upon their departure. We have previously held that a box cutter can be a deadly weapon. *State v. John Liddell*, No. W2005-00780-CCA-R3-CD, 2006 WL 2872473, at *4 (Tenn. Crim. App., at Jackson, Oct. 9, 2006), *no Tenn. R. App. P. 11 application filed*. In our view, the trial court was justified in applying this enhancement factor based either on the box

cutter, the gun, or both. We conclude that the trial court did not err when it applied this enhancement factor.

Because we have concluded that the trial court did not err when it applied any of the aforementioned enhancement factors, we conclude that it did not err in determining the length of David Avery's sentences.

### b. Consecutive Sentencing

The trial court sentenced David Avery to twenty-five years for his especially aggravated robbery conviction, twelve years for his aggravated robbery conviction, twelve years for his attempted second degree murder conviction, and eleven months and twenty nine days for his reckless endangerment conviction. It ordered all the sentences, except the sentence for reckless endangerment, to run consecutively, for a total effective sentence of forty-nine years. David Avery asserts that the trial court erred when it ordered his sentences run consecutively because the record does not support its finding that he had no regard for human life and because the aggregate sentence was not necessary to protect the public.

When it ordered David Avery's sentences run consecutively, the trial court found:

> Now, I need to . . . determine whether or not theses sentences are concurrent or consecutive. The State is relying on the fact that . . . he's a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime for which the risk to human life is high. I find that factor does apply. Mr. David Avery told Frederick [Alex] Avery to kill Mr. Gift. There was testimony that Mr. David Avery said he wanted to see Mr. Gift die. He told Mr. Frederick Avery to put him on the floor, and David Avery is the one who slit his throat. I think that is clearly a dangerous offender. But I must go further. And just because you're convicted of dangerous offenses does not necessarily mean that they need to run consecutive. Because I can only do that if the aggregate term reasonably relates to the severity of the offenses and is necessary in order to protect the public from further serious conduct by the defendant. I think those apply in this case, given the fact that he discussed killing these individuals. This was a robbery that did not have to result in any sort of harm to anyone and that it went way beyond what is necessary under the circumstances, the discussion of killing them, leaving them to die, the wanting them to die. All of that is someone that is necessary to protect the public from that individual. So I'm going to find that Counts 1, 2, and 4 are all consecutive to each other. Count 3, however, can be concurrent. That would make a total effective sentence of forty-nine years I do believe.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the

evidence, that at least one of seven listed factors exists. These factors include factor (4), that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The trial court's finding that the Defendant is a "dangerous offender" by itself is insufficient to support consecutive sentences. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "is necessary to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id.* at 938. The requirement of additional findings when the defendant is a "dangerous offender" "arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The other categories for consecutive sentencing have "self-contained limits;" thus, the additional findings are limited to cases involving consecutive sentencing of "dangerous offenders." *Id.*

In this case, as recited above, the trial court found that consecutive sentencing was reasonably related to the severity of the crime and necessary to protect the public from further criminal conduct by David Avery. Our review of the record reveals that the evidence does not preponderate against the trial court's findings. David Avery went into the victims' home to take their drugs and money. Alex Avery told Gift he would not be hurt if he remained calm. Despite this assurance, David Avery slit Regen's throat immediately after she opened the safe. After Regen seized the money and the drugs, he took Regen into the bedroom and got her gun. He had Alex Avery bring Gift into the bedroom, and the two men discussed killing the two victims in order to avoid being implicated in these crimes. David Avery then ordered Alex Avery to shoot Gift. Because Alex Avery then hesitated, David Avery himself attacked Gift, slitting Gift's throat from ear to ear. David Avery only left the scene of this crime when he was satisfied that Gift would likely die from his injuries and that Regen would not identify them. Both victims suffered serious injuries, with Gift's injuries requiring several days of hospitalization. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the harm. The Defendant is not entitled to relief on this issue.

### 2. Alex Avery Sentencing

On appeal, Alex Avery contends that the trial court improperly sentenced him as a repeat violent offender because the State did not try him within 180 days of being indicted, as he argues is required by statute. Further, he contends that the State's notice was inadequate because it was not filed until February 19, 2008, more than 180 days after his arraignment, and because the notice did not constitute affirmative notice that the State was prosecuting him as a Repeat Violent Offender. The State counters that the 180-day rule is intended not to benefit the Defendant but rather to notify society that these types of offenders will be dealt with swiftly. Therefore, even if a defendant is not tried within this time period, the trial court may sentence him as a violent offender.

19

When deciding this issue, the trial court found:

> We'll first discuss the issue of the violent offender, which relates only to Count 2. The State gave notice that was filed February the 19th. [Alex Avery's attorney] said it wasn't adequate, however, it very clearly cites the statute. It cites the fact that if he were convicted of either especially-aggravated robbery or attempted murder in the first degree that the 40-35-120(A)(3) and (A)(4) would apply. And attached to that is a copy of the conviction, especially the murder conviction. I believe there was also attached a copy of the robbery conviction to this. I'm finding several things. One, that it was adequate notice, that it was timely under the circumstances of this case, the fact that the defendants have been represented by multiple attorneys, the fact that there are two of them, and given the Court's schedule that there was good cause shown for not trying them within 180 days. So I'm finding that the notice is sufficient.
>
> Let's deal with Count 2 first then. I find that if you look at the clear wording of the statute is that, "A repeat violent offender is a defendant who" . . . "is convicted in this state on or after July 1st of 1994 of any offense classified in subsection (C) (1) as a violent offense." He was convicted in this court of especially-aggravated robbery in 2008. That is after July 1st of 1994. And especially-aggravated robbery is listed in (C) (1). It's listed at (C) (1) (D). "And has at least one conviction of an offense classified in subsection (C) (1) or (C) (2) as a violent offense." And murder in the second degree is (C) (1) (B), therefore, he does qualify.
>
> The statute goes on to say that a repeat violent offender is then sentenced to life without the possibility of parole by virtue of the statute. And therefore as to Count 3, that is the determination of the Court, having determined that he has the prior requisite conviction.

Tennessee Code Annotated section 40-35-120 governs whether a defendant qualifies as a repeat violent offender. That statute states:

> (a) A "repeat violent offender" is a defendant who:
>
> . . . .
>
> (3) Is convicted in this state on or after July 1, 1994, of any offense classified in subdivision (c)(1) as a violent offense; and
>
> (4) Has at least one (1) conviction for an offense classified in subdivision (c)(1) or (c)(2) as a violent offense; or
>
> . . . .

20

(c)(1) For purposes of subdivisions (a)(3) and (a)(4), the following offenses are classified as violent offenses:

. . . .

(B) Second degree murder;

. . . .

(g) The court shall sentence a defendant who has been convicted of any offense listed in subdivision (b)(1), (c)(1) or (d)(1) to imprisonment for life without possibility of parole if the court finds beyond a reasonable doubt that the defendant is a repeat violent offender as defined in subsection (a).

(i)(1) A charge as a repeat violent offender shall be tried within one hundred eighty (180) days of the arraignment on the indictment pursuant to Rule 10 of the Rules of Criminal Procedure unless delay is caused by:

(A) The defendant;
(B) An examination for competency;
(C) A competency hearing;
(D) An adjudication of incompetency for trial;
(E) A continuance allowed after a court's determination of the defendant's physical incapacity for a trial; or
(F) An interlocutory appeal.
A continuance may be granted to any party, including the court, for good cause shown.

(2) The district attorney general shall file a statement with the court and the defense counsel within forty-five (45) days of the arraignment pursuant to Rule 10 of the Rules of Criminal Procedure that the defendant is a repeat violent offender. The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant, shall set forth the dates of the prior periods of incarceration, as well as the nature of the prior conviction offenses. If the notice is not filed within forty-five (45) days of the arraignment, the defendant shall be granted a continuance so that the defendant will have forty-five (45) days between receipt of notice and trial.

(3) Failure to comply with this subsection (i) does not require release of a person from custody or a dismissal of charges.

T.C.A. § 40-35-120 (2006); *see State v. Thompson*, 36 S.W.3d 102 (Tenn. Crim. App. 2000).

The first issue we will address is whether the State filed adequate notice within the prescribed time period. The statute states that the district attorney shall file a statement declaring the defendant a repeat violent offender with the court and defense counsel within forty-five days of arraignment. T.C.A. 40-35-120(i)(2). Here, the notice was filed on February 19, 2008, well beyond forty-five days after arraignment. The remedy under the statute for untimely notice is to grant a continuance so that the defendant has forty-five days between receipt of notice and trial. T.C.A. § 40-35-120(i)(2). In fact, the trial in this case commenced April 10, 2008, which was more than forty-five days after the filing of the notice. This Court has previously determined that the defendant must show he or she was prejudiced due to the untimely notice. *Thompson*, 36 S.W.3d at 115-16; *see also State v. Charles Hall*, No. W2005-01338-CCA-R3-CD, 2006 WL 2334850, at *9 (Tenn. Crim. App., at Jackson, Aug. 11, 2006), *perm. app. denied* (Tenn. Dec. 18, 2006). We conclude Alex Avery has not shown he was prejudiced by the untimely notice given and he had ample time between receipt of the notice and the trial. Therefore, he is not entitled to relief on this issue.

Alex Avery next takes issue with the adequacy of the notice, stating that the motion is titled "State's Notice of Potential Punishment of Defendant." He asserts that this was mere notice and not an affirmative notice of the State's intent to prosecute him as a repeat violent offender. We disagree. The statute states only, "The statement . . . .shall set forth the dates of the prior periods of incarceration, as well as the nature of the prior conviction offenses." T.C.A. § 40-35-120(i)(2). The State's notice filed in this case stated that, if Alex Avery were convicted of either especially aggravated robbery or attempted first degree murder the repeat violent offender statute would apply, and the notice cited the repeat violent offender statute. The State attached to the notice a copy of Alex Avery's previous second degree murder conviction. We conclude that this comports with the repeat violent offender statute and that it is, therefore, adequate notice.

Alex Avery next argues that he should not have been sentenced as a repeat violent offender because he was not tried within 180 days of his arraignment. He relies upon the language in Tennessee Code Annotated section 40-35-120(i)(1) that a repeat violent offender shall be tried within 180 days of the arraignment on the indictment pursuant to Rule 10 of the Rules of Criminal Procedure. The Defendant was arraigned on September 18, 2006, and held in custody until the trial began on April 10, 2008. Alex Avery does not argue that he was prejudiced by the length of his custody but argues that the language of the statute should be construed, literally, to prohibit sentencing under the Repeat Violent Offender Act, absent compliance with the 180-day rule.

This Court has previously heard and rejected this precise argument. *State v. Ronald Dotson*, No. W2001-02548-CCA-MR3-CD, 2002 WL 31425784, at *1-2 (Tenn. Crim. App., at Jackson, Oct. 29, 2002), *no Tenn. R. App. P. 11 application filed.* In *Dotson*, we relied on our previous holding that the 180-day rule is not an iron-clad rule to be construed in favor of a defendant to conclude that a defendant, absent a showing of prejudice, may be sentenced as a repeat violent offender even though he was not tried within 180 days of his arraignment. *Dotson*,

2002 WL 31425784, at *2 (citing *see State v. Thompson*, 36 S.W.3d 102 (Tenn. Crim. App. 2000)).

In the case under submission, we first note that the trial court found that good cause was shown for any delay in trial. This alone is sufficient to support Alex Avery's being sentenced pursuant to the repeat violent offender statute despite any delay in trial. Further, however, Alex Avery does not allege that he was prejudiced by any delay in his trial. Absent such a showing, we cannot conclude his sentencing under the Repeat Violent Offender statute was improper even though he was not tried within 180 days of his arraignment. As such, he is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE